UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAVI KADIYALA, individually, and as the assignee of CREDIT UNION MORTGAGE UTILITY BANC, INC., an Illinois corp., | ) ) ) ) | |
| Plaintiff, | ) ) | No. 16 C 3549 |
| v. | ) ) | Judge Sara L. Ellis |
| MARK JOHN PUPKE, MARIE MOLLY PUPKE, NICOLE ELLERSTEIN, aka NICOLE AUGUSTE JACK, THE FLAGLER GROUP AND ASSOCIATES, a Florida sole proprietorship, JOHN P. MILLER, individually and doing business as JOHN P. MILLER, CPA, PA, a Florida corporation, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

After pouring money into a company believing he would obtain operational control of it only to find himself without any of the promised shares and the company no longer operational several months later, Plaintiff Ravi Kadiyala filed suit against Defendants Mark John Pupke and Marie Molly Pupke (collectively, the "Pupke Defendants"); John P. Miller and John P. Miller CPA, PA (collectively, the "Miller Defendants"); Nicole Ellerstein, aka Nicole Auguste Jack; and The Flagler Group & Associates (the "Flagler Group"). Kadiyala brings claims for fraud, conspiracy to commit fraud, aiding and abetting of fraud, and unjust enrichment. The Pupke Defendants filed a motion to transfer the lawsuit to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a) [23]. The Miller Defendants filed a motion to dismiss the claims against them for lack of personal jurisdiction [17].[1] Because

---

[1] Ellerstein and the Flagler Group have not appeared in the action, and executed copies of summons do not appear on the docket for these Defendants.

Kadiyala and Mark entered into agreements containing forum selection clauses mandating venue in Palm Beach County, Florida, and resolving this dispute in the Southern District of Florida would be more efficient and convenient for the remaining Defendants, the Court transfers the case to the Southern District of Florida. As a result, the Court need not address the Miller Defendants' motion to dismiss for lack of personal jurisdiction.

## BACKGROUND[2]

Kadiyala, an Illinois citizen, seeks to recover damages on behalf of himself as well as Credit Union Mortgage Utility Bank, Inc. ("Credit Union"), an Illinois corporation. Mark is a Florida citizen who, during the relevant time period, was the President and Chief Executive Officer of Euro International Mortgage Inc. ("Euro"), a member of Euro's Board of Directors, and Euro's sole shareholder. Marie, Mark's wife, also resides in Florida. She acted as Euro's Chief Operating Officer, bookkeeper, and managing accountant, and also served on Euro's Board of Directors. Ellerstein, a Florida citizen and Marie's sister, owned and operated the Flagler Group, a Florida business brokerage firm. Miller, also a Florida citizen, is a Certified Public Accountant who provided accounting services through his Florida corporation, John P. Miller, CPA, PA.

Mark founded Euro in 2002. Euro originated and brokered residential real estate mortgages. To sustain its business, Euro needed lines of credit upon which it could draw to fund

---

[2] In addressing the motions to dismiss, the Court is not limited to the pleadings. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (personal jurisdiction); *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005) (venue). Therefore, the facts in this section are taken from the complaint, the exhibits attached thereto, and the additional documents submitted by the parties. The Court resolves all factual conflicts and draws all reasonable inferences in Kadiyala's favor. *Purdue Research Found.*, 338 F.3d at 782–83; *Harris v. comScore, Inc.*, 825 F. Supp. 2d 924, 926 (N.D. Ill. 2011).

mortgages at closing and hold mortgages after closing until Euro sold the mortgages on secondary markets. These lines of credit are known as "warehouse lines." Doc. 1 ¶ 16.

In 2010, Euro sought accreditation from the Department of Housing and Urban Development ("HUD") for a license for residential mortgage origination, which would allow for greater profit generation. To receive and maintain that license, Euro had to provide HUD with audited financial statements demonstrating that Euro used appropriate accounting and reporting procedures and held hard assets of more than $1,000,000. The Miller Defendants provided these certified independent audits to HUD.

In 2012, Mark sought to sell some or all of his interest in Euro, marketing the sale through Ellerstein. The two of them circulated a prospectus, with two proposals: (1) for $1,000,000, sale of a "platform" within which to originate mortgages, including licenses in thirty-eight states, relationship agreements, and "warehouse credit facilities"; or (2) for an additional $700,000, sale of the platform and all of Euro's hard assets including real estate, furniture, fixtures, and equipment. *Id.* ¶ 21. Among other things, the prospectus represented that Euro had no debt and that appropriate audits supported its business and licenses.

In April 2012, Mark offered to sell forty-nine percent of his personal stock in Euro to Credit Union, which learned of the opportunity through the offering prospectus. Credit Union paid Mark $250,000 in cash in September and October 2012 while they negotiated the terms of the stock purchase. Credit Union also opened a branch for Euro in Illinois, undertaking all of the overhead expenses for that branch. But in late October 2012, Mark determined that he did not want to proceed with the sale to Credit Union. Credit Union then suggested to Mark that Kadiyala assume Credit Union's role as the buyer of Euro's stock. Mark accepted Kadiyala as

the purchaser in November 2012, with the parties entering into several agreements on November 7th effectuating Kadiyala's purchase of the Euro stock. Kadiyala also entered into agreements with Credit Union to stand in its shoes with respect to its prior engagements and agreements with Mark.

First, Kadiyala and Mark entered into a Stock Purchase Agreement (the "Purchase Agreement"), which provided that Kadiyala would obtain forty-nine percent of Mark's Euro stock with sixty-five percent distribution rights in exchange for $469,789.43. The purchase price was paid with $269,789.43 previously supplied by Credit Union and a promissory note from Kadiyala to Mark in the amount of $200,000, payable in $11,111.11 monthly installments for eighteen months. The promissory note payments were to be made between January 1, 2013 and June 1, 2015. Mark agreed to deliver forty-nine percent of Euro's stock certificates and other necessities to operate Euro on January 1, 2013. Mark also agreed to cooperate fully in effectuating the transfer of his stock and any business records needed to operate Euro to Kadiyala.

Kadiyala and Mark also entered into a Shareholder Agreement. The Shareholder Agreement contained an addendum providing that:

> [Mark] has pledged over $2,000,000.00 in his personal assets as security for various warehouse lines of credit issued to [Euro]. Until the over $2,000,000.00 in pledged assets are released to [Mark], [Kadiyala] shall pay [Mark], each month, interest at the rate of 5% on the total amount pledged, which currently exceeds $2,000,000.00. [Kadiyala] agrees that he will substitute his assets for [Mark's] pledged assets no later than December 31st, 2013, so that [Mark's] assets are no longer security for [Euro]'s warehouse lines of credit.

*Id.* ¶ 39. The addendum also provided that Mark had the right to remain Chairman of the Board of Directors for Euro for as long as he wanted and, in his absence, Marie would serve as the Acting Chair for as long as she wanted. The addendum also provided that Mark was entitled to "the greater of $6,500 per month or six (6) Basis Points on the monthly volume of closed loans, with payments to begin January 1st, 2013 on all closings that occurred after November 7th, 2012." *Id.* ¶ 41. But Mark's distribution was limited to thirty-five percent of Euro's profits. Finally, the addendum stated that Kadiyala would assume operational responsibility for the day-to-day management of Euro but would have to fully adhere to professional standards set forth by Mark, observe and establish procedures to control Euro's operating expenses, obtain Mark's approval for significant costs and expenses, and secure additional bond and insurance coverage to protect Mark's personal interests.

Additionally, Kadiyala and Mark executed an Option to Purchase Agreement (the "Option"), which allowed Kadiyala to purchase an additional sixteen percent of Mark's shares for (1) $10 in hand and (2) the release of all existing liens on Mark's property that had been posted as security with Euro's warehouse lenders. On the date of execution, Mark told Kadiyala that he had posted more than $2,000,000 in personal property interests in order to provide security for the $10,000,000 in warehouse lines that Euro held.

Between November 7, 2012, and January 1, 2013, Kadiyala took over the operation of Euro's Illinois branch. He personally funded all salaries and operating expenses, investing over $200,000 in the branch before January 1, 2013. Kadiyala subsequently presented Euro with an invoice for those expenses, which has not yet been paid. In November 2012, Kadiyala also

5

provided Mark with an additional $100,000 to release Mark's personal guarantee and/or assets held as security by Atlantic Coast Bank in connection with a $1,000,000 warehouse line. Kadiyala made this payment in anticipation of gaining the release of all of Mark's personal assets pledged as securities, fulfilling one of the conditions of the Option. In December 2012, Kadiyala also paid Mark $10 via cashier's check to exercise the Option.

The Purchase Agreement contemplated a January 1, 2013 closing date. Kadiyala paid Mark $36,194.44, representing the first payment under the note, the 5% interest payment for the personal assets Mark had pledged as security for the warehouse lines, and two minimum monthly payments on closed loans after November 7, 2012. Marie had represented to Kadiyala that Mark had pledged $2,900,000 in personal assets to secure the warehouse lines of credit. But Mark did not deliver the Euro shares to Kadiyala, prompting Kadiyala to make a formal, written demand for the Euro shares on January 3. Mark did not respond. On January 5, Mark told Kadiyala that Euro only had one warehouse line, the $1,000,000 line at Atlantic Coast Bank, and that all other warehouse line applications had been declined. Mark also told Kadiyala that, contrary to Marie's representation just days earlier, he did not have $2,900,000 in personal assets pledged to any lender. On January 8, Mark distributed $371,000 of Euro's funds to himself as a shareholder dividend but did not pay Kadiyala any dividend. Mark also removed real estate assets from Euro and converted the equity to more than $500,000 in cash, which he used for his own purposes.

Kadiyala then investigated Euro's books and records, finding that the 2011 financial statements did not include substantial liabilities and expenses. In February and March 2013, Kadiyala made further inquiries with the Miller Defendants regarding Euro's assets, liabilities and expenses, which the Miller Defendants did not answer. In 2014, Kadiyala obtained audited

6

financial statements the Miller Defendants prepared and submitted to HUD in 2009 and 2010 and concluded that these financial statements also did not accurately reflect Euro's assets, liabilities, and expenses or meet HUD's standards for issuance of the license that Euro had received.

Mark never supplied Kadiyala with the stock certificates or business necessities to operate Euro. Mark stopped operating Euro as an active business in early 2013 and failed to prepare audited financial statements for Euro's 2012 operations. Thereafter, Euro lost its HUD license and its license to do business in Illinois, incurring a $10,000 fine from the Illinois Department of Financial and Professional Regulation.

## ANALYSIS

### I. The Pupke Defendants' Motion to Transfer

Section 1404(a) provides that the Court may transfer venue to another district "for the convenience of the parties and witnesses, in the interest of justice." For the Court to transfer the case under § 1404(a), the Pupke Defendants must demonstrate that "(1) venue is proper in this district; (2) venue is proper in the transferee district; (3) the transferee district is more convenient for both the parties and the witnesses; and (4) transfer would serve the interest of justice." *Gueorguiev v. Max Rave, LLC*, 526 F. Supp. 2d 853, 856 (N.D. Ill. 2007). The transfer decision is committed to the Court's sound discretion because the "weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986). The parties do not dispute that venue is proper in this district. The Southern District of Florida is also an appropriate venue. Thus, the Court turns to whether transfer would serve the convenience of the parties and witnesses and the interest of justice.

Before doing so, however, the Court must address the Pupke Defendants' argument that two of the agreements between Kadiyala and Mark contain mandatory forum-selection clauses that require transferring the case to the Southern District of Florida. Specifically, the Purchase Agreement states: "This Agreement shall be construed and enforced in accordance with the laws of the State of Florida. Venue shall be in Palm Beach County, Florida." Doc. 1-2 ¶ 7(e).[3] The Shareholder Agreement between Kadiyala and Mark is not signed and provides: "For any action or proceeding arising out of or in connection with this Agreement, each Shareholder hereby irrevocably consents to the non-exclusive jurisdiction of the state and federal courts in Palm Beach County, Florida . . . ." Doc. 1-4 ¶ 15. But an earlier version, signed by Mark and Kadiyala's assignors, provides for exclusive jurisdiction in the state and federal courts of Palm Beach County, Florida "[f]or any action or proceeding arising out of or in connection with" the agreement. Doc. 23-1 at 6.

A forum selection clause "may be enforced through a motion to transfer under § 1404(a)." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, --- U.S. ----, 134 S. Ct. 568, 579, 187 L. Ed. 2d 487 (2013). Where parties have agreed to a forum selection clause, they have "waive[d] the right to challenge the preselected forum as inconvenient or less

---

[3] The Pupke Defendants attached an exhibit titled "Stock Purchase Agreement" to their motion to dismiss. This Stock Purchase Agreement and the Purchase Agreement attached to Kadiyala's complaint, both of which are signed by Pupke and Kadiyala, differ with respect to ¶ 7(e), which is more expansive in the copy provided by the Pupke Defendants. The clause in their version states: "Purchaser hereby consents and agrees that the State of [*sic*] Federal Courts located in the County of Palm Beach, State of Florida shall have exclusive jurisdiction to hear and determine any claims or disputes between Seller and Purchaser pertaining to this Agreement or any other documents or to any matter arising out of or related to this Agreement or any of the documents. . . . Purchaser expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Purchaser hereby waives any objection which it may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court." Doc. 23-1 at 12.

8

convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 582; *IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.*, 437 F.3d 606, 613 (7th Cir. 2006) (where there is a forum selection clause, transfer motion can be granted only "if there is inconvenience to some third party . . . or to the judicial system itself" (alteration in original) (quoting *Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 378 (7th Cir. 1990))). As a result, the Court "may consider arguments about public-interest factors only." *Atl. Marine*, 134 S. Ct. at 582. Under *Atlantic Marine*, a forum selection clause must be "given controlling weight in all but the most exceptional cases." *Id.* at 579 (citation omitted).

Forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972).[4] Here, both forms of the Purchase Agreement include mandatory forum selection clauses between Kadiyala and Mark, making venue mandatory in the federal or state courts of Palm Beach County, Florida. *See Burillo*, 2017 WL 693954, at *5 (collecting cases identifying mandatory forum selection clauses as those with "exclusive" language or using words such as "must" or "shall"); *Robrinzine v. Big Lots Stores, Inc.*, No. 15-cv-7239, 2016 WL 3459733, at *5 (N.D. Ill. June 24, 2016) (noting the same under Illinois law). The unsigned Shareholder Agreement includes a permissive forum selection clause, providing for non-exclusive jurisdiction in Palm

---

[4] In determining the validity of the forum selection clause, the Court looks to the law that governs the dispute pursuant to the agreements' choice of law clause. *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 991 (7th Cir. 2008) ("[T]he validity of a forum-selection clause depends on the law of the jurisdiction whose rules govern the rest of the dispute."). Although the agreements at issue specify that Florida law governs, there appears to be little difference between the enforceability of forum selection clauses under Florida and Illinois law. *Compare Burillo Azcarraga v. J.P. Morgan (Suisse) S.A.*, No. 16-cv-22046-GAYLES, 2017 WL 693954, at *5–6 (S.D. Fla. Feb. 22, 2017), *with IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 389, 378 Ill. App. 3d 77, 317 Ill. Dec. 214 (2007).

Beach County, while the signed agreement between Mark and Kadiyala's assignors provides for exclusive jurisdiction there.

Kadiyala does not address the existence of the forum selection clauses in his response, instead focusing on the choice of law clauses contained in the various agreements. Because Kadiyala has failed to make any argument that enforcement of the forum selection clauses would be unreasonable under the circumstances or that the clauses are somehow invalid, the Court finds that Kadiyala has waived any arguments he had against their enforcement. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (failure to develop an argument amounts to waiver). Kadiyala does argue that this action does not arise out of the agreements because he is suing for fraud and not breach of contract. But Kadiyala alleges that the agreements contained fraudulent language, admits this in his response, and the controversy and Kadiyala's claimed damages arise out of the allegedly unconsummated aspects of the agreements. As a result, the forum selection clauses are sufficiently broad to encompass this dispute. *See Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993) (holding the term arising out of "reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se").

Although the forum selection clauses suggest that Kadiyala's claims against Mark should be transferred to the Southern District of Florida unless outweighed by public interest factors, the Court must also take into account the fact that Kadiyala did not enter into similar agreements with the remaining Defendants. *See In re Rolls Royce Corp.*, 775 F.3d 671, 679 (5th Cir. 2014) (noting that, where a forum selection clause only binds certain parties, the court must take into account the private interests of the parties not bound by a forum selection clause in the § 1404

10

analysis). Thus, the Court examines both the public and private interest factors to determine whether to transfer all of Kadiyala's claims, keep them all here, or sever his claims against Mark and transfer those to the Southern District of Florida.

To the extent the Court may take into account private interests for Kadiyala's claims against the non-Mark Defendants, the Court considers (1) Kadiyala's choice of forum, (2) the situs of material events, (3) the relative ease of access to proof, (4) the convenience of the parties in litigating in the respective forums, and (5) the convenience of the witnesses. *Sojka v. DirectBuy, Inc.*, No. 12 C 9809, 2014 WL 1089072, at *2 (N.D. Ill. Mar. 18, 2014). Courts typically defer to a plaintiff's choice of forum, particularly when he lives in the district. *Brandon Apparel Grp., Inc. v. Quitman Mfg. Co.*, 42 F. Supp. 2d 821, 833 (N.D. Ill. 1999). The material events took place both in Illinois and Florida, making that factor neutral. Similarly, because documents are presumed to be easily transportable, the access to proof factor does not weigh heavily in favor of either district. *See Rabbit Tanaka Corp. USA v. Paradies Shops, Inc.*, 598 F. Supp. 2d 836, 840 (N.D. Ill. 2009) ("In this day and age, transferring documents from one district to another is commonplace and, given the widespread use of digital imaging in big-case litigation, no more costly than transferring them across town."). All of the parties but Kadiyala are located in Florida, suggesting that Florida would be a more convenient location for the parties to litigate the case. Additionally, the Miller Defendants have filed a motion to dismiss for lack of personal jurisdiction in this district, and the complaint includes no suggestion that they had contacts with Illinois so as to subject them to this Court's jurisdiction. Thus, this weighs in favor of transfer, where the case could be heard against all Defendants in one district. As for the

convenience of witnesses, only Kadiyala identifies potential witnesses he claims reside in Illinois, but there are only two so this factor only slightly weighs against transfer.

As for the public interest factors, the Court considers factors such as the likelihood of a speedy trial, each court's familiarity with the applicable law, the desirability of resolving controversies in each locale, and the relationship of each community to the controversy. *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010); *Coffey*, 796 F.2d at 220. Although the agreements include Florida choice of law clauses, which Kadiyala disputes apply to his claims, judges in either forum are presumed to be equally familiar with the other state's laws. *See Atl. Marine*, 134 S. Ct. at 584 ("[F]ederal judges routinely apply the law of a State other than the State in which they sit."). Judicial efficiency favors the Southern District of Florida. The average time between filing and disposition in the Southern District of Florida is 4.2 months versus 7.4 months in this district. The average time from filing to trial in the Southern District of Florida is 17.0 months versus 40.4 months in the Northern District of Illinois.[5] Both districts have an interest in the controversy, making that factor neutral. Judicial economy favors resolving the controversy in one district as opposed to severing the claims and having two parallel litigations concerning the same underlying dispute.

Taken together and in light of the forum selection clauses between Kadiyala and Mark and the desire to efficiently resolve this dispute, the Court finds it appropriate to transfer the entire case to the Southern District of Florida.

---

[5] These figures come from the website of the United States Courts detailing federal court management statistics as of December 2016. *See* http://www.uscourts.gov/sites/default/files/data_tables/ fcms_na_distcomparison1231.2016.pdf.

## II. The Miller Defendants' Motion to Dismiss

The Miller Defendants filed a motion to dismiss, arguing that the Court does not have personal jurisdiction over them in Illinois. The Miller Defendants, as Florida citizens, maintain that all of their relevant actions took place in Florida and that Kadiyala has not sufficiently alleged any contacts to bring them within this Court's jurisdiction. The Court need not address the Miller Defendants' arguments regarding personal jurisdiction because the Court is transferring the case to the Southern District of Florida, rendering the motion moot. To the extent the Miller Defendants have any objections to the exercise of that court's jurisdiction over them, they may raise them there.

## CONCLUSION

For the foregoing reasons, the Court grants the Pupke Defendants' motion to transfer [23]. The Court transfers this case to the United States District Court for the Southern District of Florida. The Court denies the Miller Defendants' motion to dismiss [17] without prejudice to renewal in the Southern District of Florida.

Dated: May 30, 2017

SARA L. ELLIS
United States District Judge